Johnnie Darlene SUTTON, Appellant,

v.

STATE of Texas, Appellee.

No. 11–81–152–CR.

Court of Appeals of Texas,
Eastland.

Sept. 16, 1982.

Discretionary Review Refused
Dec. 15, 1982.

Darrell E. Haynes, Robert Reich, Attys. at Law, Brownwood, William G. Shaw, Atty. at Law, Brownwood, for appellant.

Stephen Ellis, Dist. Atty., Brownwood, for appellee.

DICKENSON, Justice.

The controlling issue is whether a person of less than average intelligence was able to "knowingly, intelligently, and voluntarily" waive the rights which are guaranteed by Tex.Code Crim.Pro.Ann. art. 38.22, sec. 2 (Vernon 1979).[1]

Johnnie Darlene Sutton was found guilty of murder [2] after the jury was permitted to consider her written confession. The jury assessed her punishment at 12 years confinement.[3] Her court appointed lawyers have perfected an appeal.[4] We affirm the conviction.

Appellant has briefed three grounds of error contending:

1. The court erred in admitting an alleged voluntary statement into evidence over objection because the defendant was under an illegal arrest which tainted the confession so as not to be purged by "*Miranda*" type warnings.

2. The court erred in admitting into evidence that alleged voluntary statement of the defendant because the defendant did not and could not voluntarily,

---

1. This provision states that a written statement or confession may not be used unless "... the accused, prior to and during the making of the statement, *knowingly, intelligently, and voluntarily* waived the rights..." to remain silent and to have a lawyer appointed to represent him (or her) prior to and during any questioning. (Emphasis added)

2. Tex.Penal Code Ann. Section 19.02 (Vernon 1974) defines the offense of murder and declares that it is a felony of the first degree.

3. Tex.Penal Code Ann. Section 12.32 (Vernon Supp.1982) provides that an individual adjudged guilty of a felony of the first degree shall be punished by confinement for life or for any term of not more than 99 years nor less than 5 years. A fine not to exceed $10,000 is also authorized in addition to imprisonment.

4. We commend these three court appointed attorneys for their diligent efforts in appellant's behalf. The record shows that appellant was well represented.

knowingly and intelligently waive all of the rights as set out in Tex.Code Crim. Pro.Ann. arts. 38.22(2)(a)(1–5) and 15.17.

3. The evidence is insufficient to support the murder conviction of the appellant because there is insufficient corroborative evidence of an element of the corpus delicti of murder, to-wit: The proof that the decedent died as a result of a criminal act or agency of another is not established, and no rational trier of fact could have found corroboration of the essential elements of murder outside the alleged voluntary statement.

■ All three grounds of error have been considered, and they are overruled because: (1) appellant was not under an illegal arrest when she gave the voluntary statement; (2) there is evidence from which the district judge and jury could believe that appellant "knowingly, intelligently, and voluntarily" waived her right to remain silent and her right to have a lawyer appointed prior to and during the questioning; and (3) there is sufficient evidence of the corpus delicti.

The record shows that appellant went to the Brown County Courthouse at the request of a Deputy Sheriff who told her that he was investigating the death of a child. She drove her own car, and she met two deputies inside the Courthouse and went with them to the Grand Jury Room, where they could talk without being interrupted. She left her child with a lady deputy in the Sheriff's office. Both officers testified that she was not under arrest and that she would have been free to leave if she had not agreed to go with them. See *Galitz v. State,* 617 S.W.2d 949 at 957 (Tex.Cr.App. 1981, en banc). The cases cited by appellant on ground of error one are factually distinguishable.

After one of the deputies read her a *Miranda*[5] warning, they told her they were investigating the child's death. They talked briefly, and she ducked her head and started crying. They stopped talking and took her to a magistrate who "read her her rights."[6] After that they went back to the Grand Jury Room and took her "voluntary statement."[7] A lady from the child welfare office was present throughout the taking of her statement. Appellant signed each page of the handwritten statement. After it was typed, she signed each page of the typewritten statement. Omitting the statutory warnings, her confession states:

My name is Johnnie Darlene Sutton. I am 28 years of age and I live at 2304 Durham Street, in Brownwood, Texas.

I am a white female and I am married to Larry Wayne Sutton. We were married Oct. 17, 1972. I had one child prior to marrying Larry Sutton, this is Wesley Earl Dillard, date of birth February 15, 1972. Larry and I have two children Stephanie Marlene Sutton, date of birth August 22, 1973 and Angela Hestel Sutton, date of birth June 1, 1980. I am presently a housewife. I have lived in Brown County for approximately nine (9) years.

In 1978 Debbie Blanchard moved in with Larry and I as she had epilepsy and Larry was afraid to let her live alone. She got pregnant with Larry's baby while she was living with us. When I found out Debbie was pregnant, I ran her off. She was approximately six (6) weeks along at this time.

During this pregnancy, Debbie and I, also Larry and I had a lot of arguments and fights. Because Larry catered to her and he also took care of her. Hatred grew in me toward Debbie for what she had done to me. During the last twenty-two months, I have kept both of Debbie's children, Deanna and Bradford, on many occasions while Larry and Debbie would go off together for several hours at a time. I do know that Larry and Debbie slept together and had sex with each

5. See *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

6. See Tex.Code Crim.Pro.Ann. art. 15.17 (Vernon Supp.1982).

7. It contained the warnings required by Tex. Code Crim.Pro.Ann. art. 38.22 (Vernon 1979).

other in my house many times. Debbie would laugh and make fun of me because she was having sexual relations with Larry. She would tell me about them and she would also tell me that she was going to take Larry away from me. The more Debbie done to me the more I hated her. Up to last Saturday night I had no hatered for Debbie's child, Bradford. I would play with the child and I was good to him. I just hated his mother.

Last Saturday, April 11th, 1981, at approximately 10:00 a.m. Larry left our house. He stated that he had some business to take care of and that it did not have anything to do with another woman. Approximately 3:00 p.m., the City Police came by my house looking for Larry. Then at approximately 5:00 p.m. I was at my father-in-law's residence at 109 Booker. His name is Fowler Sutton and he came in and told me that Larry had supposedly kidnapped Debbie. I was very upset with Larry and mad at Debbie. Fowler Sutton then carried me home.

At approximately 6:30 p.m. to 7:00 p.m. o'clock, I started to walk over to Debbie's and Larry picked me up before I got there. We went home and had an argument then approximately 7:00 p.m. the police came and arrested Larry.

At approximately 9:00 p.m., April 11th, 1981, I walked up to the County jail and got my car keys. I walked about halfway home and a mexican fellow picked me up and carried me the rest of the way. My two children that were home, Wesley and Angela, I picked them up and went after cigarettes. This was approximately 10:30 to 11:00 p.m. I then went back home. I sat on the couch and smoked a cigarette and thought and the more I thought, the madder I got. I blamed Debbie for Larry being in jail and I was trying to think of something I could do to hurt her.

At approximately 11:45 p.m., April 14th, 1981, I took Wesley and Angela and went to 1601 Ave. E. I went over there to ask Debbie why they turned Larry in. I sent my son Wesley to the door to ask Debbie to come outside so I could talk with her. My son came back and stated that she had gone with her mother and daddy. We then drove to the carnival but my children could not ride anything as I did not have any money. We then went home. This was approximately 12:30 a.m., April 12th, 1981. I put my children to bed and I sat in the living room and thought and got madder.

Then approximately 2:30 to 3:00 a.m. I was so mad I decided to go back to 1601 Ave. E and either talk to Debbie or knock her in the head. I planned on knocking her out at least for what she had done to me. I did not carry a weapon with me but I did think about I could pick up something over there, like a pan or something.

When I got there I parked one house down from 1601 Ave. E. I went to the front door and it was locked. I then went to the rear of the apartment to check and see if any windows were open. I then went to the side on fourth street and the kitchen window was open. I climbed in and I went to the back bedroom to see if Debbie was there. There was a boy "I think Darryl" on the bed. I then went to the other bedroom and Florine Reynolds was asleep on that bed. I then went to the living room. There was a big boy sleeping on the couch and Brad and Roy Lee were asleep on the floor. I did not turn any lights on as the back bedroom and bathroom lights were already on. In the living room the t.v. was still on. I could see very well with these lights.

Brad was laying there with a pamper on and I decided to take him to my house and play with him awhile. I picked him up and unlocked the front door and went out that way. Brad woke up as I was putting him in my car. I sat him in the seat beside me. He was just sitting there looking around as I drove to my house. I told him I was going to take him to my house and play with him awhile. I carried him into my house and sat him on the couch. I do not think I was in their house for over five minutes. I played

patty cake with Brad for approximately 15 seconds and he was laughing and giggling like a baby does. As the child was laughing, I could see his mother, Debbie laughing. I felt I could see Debbie in the child and I wanted to hurt her. I was so mad I just reached to the other end of the couch and got a pillow that was laying there. I then took the pillow with both of my hands and pushed the child back with it. I held the pillow by both ends. I had a hand on each side of the childs face pushing the pillow down as hard as I could. Brad kicked a little bit. The child kicked for approximately 10 minutes while I was pushing down on the pillow. I held the pillow down as hard as I could for approximately five more minutes after he quit kicking. While the child was kicking he was making a whining type noise as he was trying to breath.

I raised the pillow up off the childs face to see if he was still alive. He was not breathing but I could feel a pulse on his neck. I then went to the bathroom and wet a washcloth and rubbed his face to see if he would come back to but he never did. I sat on the couch with him a while longer and patted his face to see if he would come back to. I then felt of his pulse on his neck and it was not beating.

I then thought I had better get him home as I knew that I had killed the child. I then paced the floor thinking why did I kill him as he had never done nothing to me. I picked up the child and carried him to my car. I went to the passenger side of my vehicle and put the child in the front seat. I then got in the car and drove to 1601 Ave. E and parked my car on fourth street. I was across the street and toward the back of the house.

At this time I checked the child again and I knew he was dead. I got out of my car and took the child out the drivers side of my car. I carried the child across the street and went to the front door. I opened the door and went in and laid the child on the living room floor. I then went over to the front door and closed it and locked it. I then went and crawled out the kitchen window. I had removed the screen when I entered the house earlier so after I crawled out I put the screen back on the window. I got in my car and went home. I stayed up till approximately 6:00 a.m. worrying that I would get caught for killing the child. After I got back home I felt satisfaction as I had finally gotten even with Debbie. I was glad I hurt her but I did feel sorry for the child.

I went to the funeral Monday and as I saw Debbie at the funeral, I thought I finally got even with her. I felt satisfaction for what I did toward Debbie but I did feel bad about the child. As I saw the child in the casket I felt I had done the right thing for his sake as I felt the child was better off with God than he was with her. This is because of my hatered for her.

s/Mrs. Darlene Sutton

The victim's mother confirmed that her dead baby was fathered by appellant's husband while she was living in the house with them. An eyewitness confirmed that he saw a small lady who looked like appellant at about 5:15 a.m. on April 12, 1981. He testified that:

The woman stepped out (of the car), stood by the open door on the driver's side and then leaned back in and a few seconds later brought out what appeared to me to be the body of a baby or a baby.... The woman carried the baby to the corner of my apartment.... I couldn't determine exactly where she had went. Then I heard a noise that sounded to me like someone was going into the house.

A few minutes later I heard another noise that sounded like someone was climbing out of the house. I heard a window shut, and I heard what sounded to me like a window screen being replaced.... Then I saw the girl come back. She didn't have the baby this time. She came back from the corner of my apartment, walked over to her car. She got in, sat there a few moments, started up her car and drove off....

The witness called the police after he learned of the child's death. The police went to talk with appellant because they knew the victim's mother had charged appellant's husband with kidnapping and rape shortly before the baby's death.

The trial court held a *Jackson v. Denno* hearing [8] and made a finding that appellant's statement was voluntarily made.[9] The jury was also instructed that:

> (B)efore you can consider such statement as evidence in this case, you must find from the evidence beyond a reasonable doubt that prior to and during such statement, if any, the defendant knowingly, intelligently and voluntarily waived the rights hereinabove set out in said warning, and unless you so find, or if you have a reasonable doubt thereof, you will not consider the statement for any purpose whatsoever or any evidence obtained as a result of same.

We hold that there is evidence from which the trial court and the jury could conclude that appellant "knowingly, intelligently and voluntarily" waived her rights to remain silent and to have a lawyer appointed to represent her during the questioning. The two deputies who took her statement, a lady who witnessed the taking of the statement, and a magistrate so testified. Their testimony is sufficient to create a fact issue for the jury to decide.

The testimony of the psychologist and psychiatrist was not conclusive on this issue. Even though they evaluated appellant's mental ability as "borderline," they conceded that she was not mentally retarded under the standard definitions. The psychologist measured appellant's IQ as 70, defining that score as falling "in the borderline range of intellectual functioning." [10] The evidence shows that appellant can read and write and also that she was in special education classes, quitting school in the 11th grade. The psychologist and psychiatrist testified that appellant was not in the "mentally defective range." They conceded that it was possible that she could have understood the warnings which were given. See and compare the cases cited in *Jurek v. Estelle,* 623 F.2d 929 at 951, footnote 24, and at 968, footnote 19 (5th Cir.1980). In this case there is absolutely no showing of coercion or overreaching. Appellant was taken before a magistrate, and she was given at least four warnings before her statement was taken and signed.

The judgment of the trial court is affirmed.

---

**8.** See *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

**9.** There was full compliance with Tex.Code Crim.Pro.Ann. art. 38.22, sec. 6 (Vernon 1979).

**10.** The psychologist testified that average IQ is from 90 to 109; dull normal is from 80 to 89; borderline is from 70 to 79; and below 70 is mentally defective.